UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 08-207-DLB

TOM SEEGER                                                                                                PLAINTIFF

vs.                        **MEMORANDUM OPINION AND ORDER**

**CINCINNATI BELL TELEPHONE CO., LLC**                         **DEFENDANT**

\*    \*    \*    \*    \*    \*    \*

Plaintiff Tom Seeger ("Seeger") commenced this action against Defendant Cincinnati Bell Telephone Company, Inc. ("CBT") alleging age discrimination in violation of the Age Discrimination and Employment Act ("ADEA"), 29 U.S.C. 626, *et seq.*, and Kentucky law and interference and retaliation in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654.

This matter is currently before the Court on Defendant's Motion for Summary Judgment (Doc. #29). The motion has been fully briefed, (Docs. # 29, 32, 34), and Oral Argument was held on August 13, 2010.¹ The matter is now ripe for review. For the reasons set forth below, because Plaintiff failed to establish that Defendant's reason for his discharge was pretextual, Defendant's Motion for Summary Judgment is **GRANTED**.

### I.     FACTUAL AND PROCEDURAL BACKGROUND

Tom Seeger was an employee of CBT from September 17, 1979 until October 31,

---

¹ Defendant's Motion for Summary Judgment as to Counts I and II, the age discrimination claims, was granted without opposition at the Oral Argument (Doc. #40).

1

2007.  Seeger was a member of a collective bargaining unit represented by the Communications Workers of America (the "Union").  The last position he held at CBT was as a Network Technician.  His wife, Rose Seeger, was also employed by CBT as a Network Technician in October 2007 and is currently employed as a Central Office Technician.  During his employment, Seeger met performance expectations and never faced any disciplinary actions.

CBT offers its employees paid disability leave, under its Sickness and Accident Disability Plan, to run concurrently with unpaid FMLA leave.  However, employees applying for the paid leave are subject to additional requirements–(1) the employees must consent to providing CBT access to their medical records; and (2) the employees must work a modified or light duty position if they are medically able to do so.  CBT offered a number of light duty positions to its employees, all specifically developed to meet an employee's individual medical restrictions.  Seeger's immediate supervisor stated that since he had been the Manager of Installation, CBT "ha[d] been able to accommodate everyone's needs."  Possible light duty positions included stocking shelves or pulling orders in the warehouse (referred to as the "cage"), posting inventory entries on a computer, security of the building, and answering telephones.  Seeger was aware that these positions existed.

In 2007, all FMLA and/or disability leave requests were sent to CBT's Health Services.  Theresa Greenwald, a registered nurse with more than thirty-five years of experience[2], managed the department and was ultimately responsible for approving leave requests.

---

[2] Greenwald is also certified in rehabilitation nursing and case management.

## A. Seeger's Medical Treatment

On August 20, 2007, Seeger went to the emergency room complaining of pain in his left leg. He was prescribed Vicodin and Naproxen. On August 23, 2007, he followed up with his primary care physician's office, Patient First Physicians Group[3]. Seeger reported his pain was better, but he continued to experience a great deal of pain in the morning. He also stated he was better with nonsteroidal anti-inflammatory drugs. Dr. Hammons diagnosed Seeger with left leg pain and gave him a shot of steroids, Depomedrol and Dexamethasone, and then prescribed a muscle relaxer, Skelaxin.

Seeger originally requested leave from August 20, 2007 until August 26, 2007. After receiving the steroid injection, his symptoms improved and he returned to work the following Monday. However, by September 4, 2007, his pain had returned, and he made another appointment at Patient First Physicians Group. On September 5, 2007, Seeger was seen by Dr. Pat Meade who suspected a herniated disc and referred Seeger for an MRI. Seeger was diagnosed with a herniated lumbar disc and commenced another leave of absence.

Seeger was then referred to neurosurgeon, Bradbury Skidmore, M.D., at the Mayfield Clinic. On September 10, 2007, the Mayfield Clinic obtained an initial intake from Seeger.[4] Seeger reported left hip pain and numbness in his left leg. On a scale of 0-10

---

[3] Seeger was unable to see his primary care physician, Michael Grainger, M.D., on that day and saw his colleague, Dr. William Hammons, instead.

[4] From the medical records, it is unclear whether Seeger was actually seen at the clinic on September 10, 2007 or if he simply provided the intake information via questionnaire or telephone. The medical records state that the information was *reviewed* by Dr. Skidmore on September 11, 2007, so it appears Seeger did not ever have an appointment with Dr. Skidmore. Furthermore, Seeger does not recall whether he was at the clinic on those particular days. Finally, in Plaintiff's discovery responses, he does not identify Dr. Skidmore as a medical provider for the treatment of his herniated disc.

(0=no pain; 10=unbearable pain), Seeger described his pain as a 10 but stated the pain improves when he lies down. *Id.* Seeger also reported he received a Medrol dose pack and was taking Prednisone and Etodolac. On September 13, 2007, after Dr. Skidmore had reviewed Seeger's information, care coordinator, Banita Bailey, called Seeger to discuss Dr. Skidmore's impression. Dr. Skidmore recommended physical therapy and an epidural steroid injection consultation with Dr. Philip Zaacks. At this time, Seeger stated there were no changes in his symptoms since the initial intake.

On September 17, 2007, Seeger presented to Commonwealth Physical Therapy and Rehabilitation–Alexandria. Seeger complained of left leg numbness and pain and testicular pain. He reported a sitting and standing tolerance of only thirty minutes. Seeger stated he has a difficult time getting started in the morning but felt better once he was up and moving around. He stated that his pain was initially 10/10 but had gone down to a 6/10 this particular day, especially since taking the Prednisone. A treatment plan was initiated to consist of three physical therapy sessions per week for a total of four weeks. On September 19, 2007, Seeger was examined by Dr. Grainger. Seeger complained of numbness in his left leg and burning pain in his lower back. Dr. Grainger observed that Seeger was quite uncomfortable and had difficulty changing positions and ambulating. Dr. Grainger diagnosed him with left sciatica and lumbar radiculopathy, a pinched nerve in the lower back that causes pain, numbness, tingling and sometimes weakness to the lower extremities.[5] Dr. Grainger instructed Seeger to continue physical therapy , see Dr. Zaacks

---

[5] The pain associated with sciatica fluctuates. Typically a patient is instructed to rest when experiencing an episode of sciatica, but the ultimate goal is to increase activity.

for pain management, and remain off work.[6] On September 20, 2007, after an inquiry by Greenwald as to whether Seeger could return to work on restricted duty as little as two hours a day, a physician's assistant from Dr. Grainger's office left a voice mail message for Greenwald stating that Seeger would be unable to perform restricted work. However, Dr. Grainger also testified that he did not directly make this determination, but rather it was inferred from his September 19 office note stating no work.[7]

On September 27, 2007, Seeger presented to Dr. Zaacks at the Mayfield Clinic. Seeger complained of discomfort and numbness all the way down his left leg into his toes and difficulty walking. He stated the Medrol dose pack afforded him no relief, but after five sessions of physical therapy, his pain was improving. After completing the physical exam, Dr. Zaacks gave Seeger an epidural steroid injection.

On October 3, 2007, Seeger returned to Dr. Grainger's office for a follow-up appointment. Seeger reported that his leg numbness and back pain were much better. After conducting a physical examination, Dr. Grainger recorded that Seeger's range of motion had also improved. Seeger testified that at this appointment he told Dr. Grainger he was bored and wanted to return to work, but Dr. Grainger would not allow him to do so. However, at his deposition, Dr. Grainger opined that based on the medical record Seeger would have been able to return to work on light duty on October 3, 2007.

On October 11, 2007, Seeger received his second epidural steroid injection. On

---

[6] Seeger also stated that Dr. Grainger advised Seeger to engage in whatever physical activities he could tolerate, including walking.

[7] While Seeger alleges that he did tell Dr. Grainger about CBT's light work option, Dr. Grainger's testimony is unclear as to whether he was made aware of this. However, Dr. Grainger did testify that he did not believe Seeger ever asked him to remain off work.

October 15, 2007,[8] Seeger had another follow-up appointment with Dr. Grainger. Dr. Grainger recorded that Seeger had been "asymptomatic since Saturday" and his physical exam was "normal." Dr. Grainger released Seeger to go back to work on October 16, 2007.[9]

### B. Disability Fraud Investigation

On September 23, 2007, two CBT employees observed Seeger at Oktoberfest, a street festival in downtown Cincinnati. Glen "Marty" Adkins and Michael Caplinger both observed Seeger "walking unassisted and seemingly unimpaired through the crowded festival."[10] Caplinger talked with Seeger for about fifteen minutes and, after their conversation, only saw Seeger walk a few feet in the opposite direction. Adkins saw Seeger on two separate occasions at Oktoberfest, once talking to Caplinger and once walking through the crowd for approximately fifty to seventy-five feet.

---

[8] The date of this doctor's appointment is disputed. The actual medical record is dated October 12, 2007. At the arbitration hearing on September 29, 2009, Seeger testified that he saw Dr. Grainger on both October 12 and October 15. However, Seeger testified at his deposition that he was mistaken, and he only saw Dr. Grainger on October 15, 2007. This discrepancy was not brought to CBT's attention until this lawsuit was initiated.

[9] The date of this appointment is significant because it establishes when Seeger became asymptomatic in relation to his return to work. If the appointment was on October 12, 2007, he would have been asymptomatic since October 6, 2007, 10 days before he returned to work. If the appointment was on October 15, 2007, he would have been asymptomatic since October 13, 2007, only three days before he returned to work. Additionally, October 15 would have been the first available appointment he could get with Dr. Grainger to release him back to work since it was the first weekday after his symptoms resolved. CBT required a doctor's release to come back to work.

[10] Adkins and the Seegers have had some problems with each other in the past. In January 2007, Rose Seeger filed a grievance against Adkins because he was moving equipment in and out of the cage, which was hourly work reserved only for the union members. Additionally, Adkins made negative comments concerning the Seegers' work quality without properly reporting the issues to management. The Seegers felt Adkins created a "hostile environment." On the other hand, the Seegers and Caplinger had a good working relationship. Caplinger considered Seeger a friend. He found it very difficult to give his affidavit against Seeger and did not want to be involved in the investigation.

6

Seeger testified the festival was not crowded and, while he could not attest to what Caplinger saw, Seeger believed he was walking impaired. In fact, Seeger saw two other co-workers at Oktoberfest, Larry Curless and Jim Schulten, and he had conversations with both of them regarding his back problems and time off of work.[11] Curless stated that Tom "appeared to be in a lot of pain." However, Seeger admitted that he drove himself and his wife to the festival, walked a total of ten blocks to and from the festival, walked around the festival for an hour and a half and had one or two beers. Seeger was not on any pain medication at this time because it made him nauseous.

Adkins had heard that Seeger was on disability leave that was recently extended and reported the Oktoberfest sighting to Tracy Wilson, a Human Resources (HR) Manager. Wilson told Adkins to put his statement into an email. Pursuant to proper protocol, Wilson forwarded this email to his supervisor, Michelle Simpson, Director of Employee Relations and Recruiting. Simpson told Wilson to gather facts from the witnesses. Wilson talked to Caplinger and put his notes from their meeting into an email to Simpson. Simpson never spoke to Adkins or Caplinger but began her own investigation.

Simpson reviewed Seeger's medical file that included case notes made by Greenwald and her clerks. She also reviewed Seeger's appraisals and behavioral file. She did not talk to Seeger's supervisors or his doctors. She noted that Seeger reported 10/10 or excruciating pain and had difficulty ambulating and changing positions; yet, only a few days later, he was seen walking unimpaired at Oktoberfest. Additionally, there was no

---

[11] While Seeger now offers the affidavits of Curless and Schulten in his Response to Defendant's Motion for Summary Judgment, he never brought this evidence to CBT's attention during his disability fraud investigation. Wilson even asked Seeger for a written statement regarding anything he wanted CBT to know about the situation. However, Seeger failed to mention these other witnesses to dispute the alleged disability fraud.

medical treatment plan that included walking.

Theresa Greenwald made the ultimate determination about whether Seeger's leave was approved or not and whether it was qualified as unpaid FMLA or paid disability leave. On October 15, 2007, during the disability fraud investigation, Seeger was approved for paid disability leave from September 5, 2007 until September 24, 2007, and included the additional date of September 27, 2007.[12] Seeger was approved for unpaid FMLA leave from September 24, 2007 until September 27, 2007 and from September 28, 2007 until October 8, 2007.[13] According to Greenwald, Seeger was not approved for paid disability for the last two range of dates because he was at Oktoberfest and capable of returning to work on restricted duty. After this determination had been made, Seeger applied for more leave up until October 16, 2007. On October 26, 2007, Seeger was approved for unpaid FMLA leave for this additional period of time but not for paid disability leave.

Based upon the information Simpson reviewed, she decided to suspend Seeger and asked Wilson to set up a suspension meeting, which was conducted on October 31, 2007. At the meeting, Wilson asked Seeger for a written statement regarding anything he wanted CBT to know about the situation. Seeger submitted a written statement that Wilson gave to Simpson. In his statement, Seeger admitted to being at Oktoberfest but stated that in between the time he saw Dr. Grainger on September 19, where the records indicated he had trouble changing positions and ambulating, and when he went to Oktoberfest, he had

---

[12] Although the parties do not address why this additional date was approved for paid disability leave, a review of the record reveals that it was likely approved because Seeger received an epidural steroid injection on September 27, 2007 and was instructed not to engage in any heavy lifting and to resume normal activity in twenty-four hours.

[13] October 8, 2007 was the original end date Dr. Grainger filled out on the certification of Seeger's first application for FMLA/disability leave.

attended two physical therapy sessions. Seeger also stated that he was in pain the whole time he was there but did get some relief when he took short walks. Seeger also reported that it was Dr. Grainger who told him walking was beneficial to his condition. Finally, Seeger stated that he had asked Dr. Grainger to return to work on two occasions but Dr. Grainger refused to let him do so. Dr. Grainger told him that he could not even perform seated work because it would put increased pressure on his lower back.

Seeger also had Dr. Grainger submit a letter to CBT after his suspension hearing. Dr. Grainger stated that "[w]alking for one and a half hours at one's own pace doesn't equal working for an eight hour day nor is it reasonable to assume that he could perform even limited duties for an eight hour day. Most patients with herniated discs are most comfortable standing and/or walking but unable to sit or change positions." Despite the additional information provided by Seeger and Dr. Grainger, Seeger was terminated on November 8, 2007, effective since the date of his suspension.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The "moving party bears the burden of showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). The

moving party may meet this burden by demonstrating the absence of evidence concerning an essential element of the nonmovant's claim on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, it must produce specific facts showing that a genuine issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). If, after reviewing the record in its entirety, a rational fact finder could not find for the nonmoving party, summary judgment should be granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).

**B.     FMLA**

The FMLA entitles an eligible employee to twelve weeks of leave during any twelve-month period if "a serious health condition [ ] makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." *Id.* at § 2611(11).

Plaintiff brings two theories of recovery under the FMLA: (1) the "entitlement" or

"interference" theory arising from 29 U.S.C. § 2615(a)(1) and (2) the "retaliation" or "discrimination" theory arising from 29 U.S.C. § 2615(a)(2).  *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004).  Title 29 U.S.C. § 2615(a)(2) provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]."  Additionally, the Sixth Circuit has held that a claim that an employee was terminated for taking FMLA leave is also recognized under the interference theory.  *Chandler v. Specialty Tires of Am. (Tenn.), Inc.*, 283 F.3d 818, 825 (6th Cir. 2002) (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001)).  *See also Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2007).  Plaintiff makes no distinction between his retaliation and interference claims, and, therefore, the Court will address both claims under the retaliation theory.

The Sixth Circuit has held that FMLA retaliation claims based upon indirect evidence should be analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Skrjanc*, 272 F.3d at 315.  Under *McDonnell Douglas*, a Plaintiff must first prove a prima facie case of retaliation.  *Skrjanc*, 272 F.3d at 315.  The burden then shifts to the Defendant to provide a legitimate, non-discriminatory reason for the Plaintiff's termination.  *Id.*  If the Defendant sets forth such a reason, the Plaintiff must show that the nondiscriminatory reason is pretext.  *Id.*

### 1. Prima facie case

In order to establish a prima facie case of retaliatory discharge, Plaintiff must show that (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the adverse

employment action and the protected activity. *Byson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007) (citing *Skrjanc*, 272 F.3d at 314).

Defendant does not dispute the first two elements. However, Defendant argues that Plaintiff cannot establish a causal connection between Seeger's FMLA leave and his subsequent termination. Defendant argues that Seeger lacks any evidence of retaliatory intent by CBT. First, Seeger's FMLA leave was approved. Furthermore, Simpson, the person in charge of terminating Seeger, had never even met or heard of Seeger until she was contacted about the potential disability fraud. Plaintiff responds that a causal connection exists between his FMLA leave and discharge because there is a close proximity in time between Seeger's leave and his termination–Plaintiff was terminated within three weeks of his return to work from FMLA leave and less than two months since he first notified CBT of his medical leave.[14]

To establish a causal connection, Seeger must "proffer evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)). The Plaintiff's burden at this point is minimal. *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (citing *Dixon*, 481 F.3d at 333). It has been held that a proximity in time between the statutorily protected activity and the

---

[14] The first entry in Seeger's medical case notes kept by the Health Services Department is September 10, 2007. The note records that Seeger "called to report absence, off work 8/20/07 to 8/27/07 and off work again now starting 9/5/07. I [CBT employee] emailed fml forms and disability forms to [Seeger]." (Simpson Deposition, Ex. 14). Seeger was suspended on October 31, 2007and terminated on November 8, 2007.

adverse employment action may raise a prima facie case of retaliation.[15] *Chandler v. Specialty Tires of Am. (Tenn.), Inc.*, 283 F.3d 818, 826 (6th Cir. 2002); *see Singfield v. Akron Metro. Housing Authority*, 389 F.3d 555, 563 (6th Cir. 2004) (three month gap between Plaintiff's discrimination charge with the EEOC and termination sufficient to infer a retaliatory motive); *see Skrjanc*, 272 F.3d at 314, 317 (one month gap between Plaintiff's notice to employer of intention to take FMLA leave and discharge sufficient to establish indirect evidence of a causal connection for prima facie case).[16]

Although a relatively close call in this case, the Court finds that Seeger has established a prima facie case of retaliatory discharge. The proximity in time between Seeger's FMLA leave and his termination is sufficient to establish indirect evidence of a causal connection between the two. *See Bryson*, 498 F.3d at 571; *Skrjanc*, 272 F.3d at 314, 317. CBT argues that the temporal proximity is insufficient in this particular case, since Seeger was terminated for disability fraud and his paid disability ran concurrently with his FMLA leave. Therefore, it is expected that his termination would occur shortly after his

---

[15] There has been plenty of confusion in the Sixth Circuit regarding temporal proximity as it relates to a prima facie case of retaliation. Recent case law cites to *Nguyen v. City of Cleveland*, 229 F.3d 559, 565-67 (6th Cir. 2000) for the proposition that temporal proximity alone is insufficient to raise an inference of retaliation. *E.g., Tuttle v. Metro. Gov't. of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007). However, *Nguyen* made no such holding; rather, the Court noted that "while there may be circumstances where evidence of temporal proximity alone *would* be sufficient to support [the] inference [of retaliation], we do not hesitate to say that they have not been presented in this case." *Nguyen*, 229 F.3d at 567. Therefore, "this Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 524 (6th Cir. 2008) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004)).

[16] In its reply, Defendant correctly states that temporal proximity, alone, is insufficient to survive a summary judgment motion. (Doc. #34, 3). Where the employee has no other evidence but proximity in time between the protected activity and discharge, such proximity is insufficient to establish that the employer's reason for terminating the employee was pretextual. *Skrjanc*, 272 F.3d at 317. However, Plaintiff only asserts a temporal proximity between his FMLA leave and termination to show that a *causal connection* exists in order to establish a prima facie case of retaliation, not as evidence of *pretext*.

leave. However, the Sixth Circuit has held that "a court must examine plaintiff's evidence [at the prima facie stage of a termination case] independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff." *Macy v. Hopkins County School Bd. of Edu.*, 484 F.3d 357, 366 (6th Cir. 2007) (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000)). Therefore, CBT's proffered nondiscriminatory reason does not discount the proximity in time between Seeger's FMLA leave and his termination.

### 2. Nondiscriminatory reason

The burden now shifts to CBT to articulate a legitimate, nondiscriminatory reason for terminating Seeger. To meet its burden, CBT "must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful [retaliation] was not the cause of the employment action." *Bryson*, 498 F.3d at 571 (quoting *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Defendant argues that it terminated Seeger because its investigation found inconsistencies between Seeger's attendance at Oktoberfest and his medical records, indicating that he had attempted to defraud the company's disability plan. CBT's investigation did not begin until it was notified by another employee that Seeger was walking unassisted and seemingly unimpaired at Oktoberfest shortly after his medical leave was extended. Seeger's attendance at Oktoberfest was corroborated by another employee, and, when questioned, he agreed that Seeger was walking unassisted and seemingly unimpaired. CBT also reviewed Seeger's employment history and medical file, with the help of a very experienced registered nurse. CBT believes disability fraud is a

14

serious issue and has previously terminated other employees for the same reason.[17]  This evidence is sufficient to meet CBT's burden that it had a legitimate, non-retaliatory reason for terminating Seeger.  Accordingly, the burden shifts back to Seeger to produce sufficient evidence to show that the reason was merely pretext.

    **3.  Pretext**

Finally, the Court must decide whether Seeger has produced evidence that would allow the jury to reasonably conclude that CBT's proffered reason is simply a pretext for unlawful retaliation.  *See Bryson*, 498 F.3d at 572.  Seeger can demonstrate pretext by showing that the reason "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct."  *Singfield*, 389 F.3d 555, 564 (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2001)).  Seeger argues that CBT's reasons for terminating him had no basis in fact.  The Court disagrees.

In order to establish CBT's reasons for termination had no basis in fact, Seeger "must allege more than a dispute over the facts upon which his discharge was based.  He must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action."  *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001) (citing *Smith v. Chrysler*, 155 F.3d 799, 806-07 (6th Cir. 1998)).  To determine whether an employer had an honest belief in its nondiscriminatory basis for an employee's termination, the Court looks to whether the Defendant can establish its "reasonable reliance on the particularized facts that were before

---

[17] A CBT employee with Seeger's seniority could receive a full 52 weeks of disability pay at 100% of his regular pay.

15

it at the time the decision was made." *Id.* (citing *Smith*, 155 F.3d at 807). However, this does not require that the employer's decision-making process be "optimal" or leave "no stone unturned." *Id.* (quoting *Smith*, 155 F.3d at 807). Rather, the employer is only required to make a "reasonably informed and considered decision" before discharging the employee. *Id.* (quoting *Smith*, 155 F.3d at 807). "[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 398 (6th Cir. 2008) (quoting *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1107 (6th Cir. 2001)). While the Court should not automatically assume that an employer's description of its reasons is honest, the court should "resist attempting to micro-manage the process used by employers in making their employment decisions." *Smith*, 155 F.3d at 807.

CBT argues it reached an "honest belief" that Seeger committed disability fraud after conducting a thorough investigation. CBT interviewed and took formal statements from the witnesses involved. Simpson reviewed Seeger's medical records with the assistance of Greenwald, a registered nurse with thirty-five years of experience. Ultimately, CBT points to the following evidence that Simpson relied upon in making her termination decision:

1. On September 17, 2007, Seeger reported that he could only stand for thirty minutes at a time. However, on September 23, he stood and walked around Oktoberfest for at least 90 minutes.

2. On September 13, 2007, Seeger described his pain as 10/10–excruciating and unbearable; yet, Seeger was not taking any narcotic pain medication because of the adverse side effects.

16

3. On September 19, 2007, Dr. Grainger reported Seeger was having difficulty changing positions and ambulating. Again, only days later, Seeger drove himself to Oktoberfest and walked at least ten blocks to and from the festival. While he was at the festival, two co-workers saw him walking unassisted and seemingly unimpaired.

4. On October 15, 2007, Seeger called CBT to report that his symptoms had spontaneously disappeared, and he was released to come back to work the following day. However, Seeger's medical records report that Seeger told Dr. Grainger he had been pain free since October 6.

CBT's paid disability leave requires employees to work modified or light duty positions if they are medically able to do so. CBT believed these facts showed Seeger was capable of light duty work but over-reported his symptoms in an attempt to defraud the company's disability plan.

Seeger argues that CBT's reason for termination lacks credibility. Seeger points to additional facts, that CBT had knowledge of at the time of its termination decision, to show its nondiscriminatory reason is pretextual, including:

1. Seeger had no disciplinary or performance issues throughout his twenty-eight (28) years of employment.

2. Seeger had a steroid injection at the end of August.

3. Seeger had multiple physical therapy appointments during September and October, most notably three appointments between his reporting of pain at a 10/10 level and the Oktoberfest sighting.

4. Dr. Grainger submitted a letter explaining that most patients with herniated

17

discs are most comfortable standing and/or walking but unable to sit or change positions.

Seeger also alleges that the final appointment he had with Dr. Grainger was on October 15, 2007, not October 12 as the medical record states. Indeed, Dr. Grainger agreed in his deposition that he may have misdated the medical record. Therefore, despite Defendant's contention, Seeger was not asymptomatic for nine days before returning to work. Further, Seeger argues that CBT could have sent Seeger to another doctor for evaluation or at least called Dr. Grainger to clarify any inconsistencies in the medical records. Given these additional facts, Seeger argues that a jury could easily reject CBT's so-called honest belief that Seeger committed disability fraud.

Seeger has failed to show that CBT's proffered reason for his discharge had no basis in fact and was therefore a pretext for FMLA retaliation. First, Seeger's argument concerning the misdated medical record is wholly inapplicable to the Court's analysis. CBT made its decision with respect to the medical records it had at the time of Seeger's termination. CBT had no knowledge that the medical record was misdated and when Seeger was asked to submit additional information regarding the alleged fraud, he made no mention of the incorrect date. Therefore, this subsequent evidence cannot be considered. As to Seeger's remaining arguments, he simply disputes the facts upon which his discharge was based. He has offered no evidence to show that CBT did not honestly believe that he committed disability fraud. It is well settled that "it is inappropriate for the judiciary to substitute its judgment for that of management." *Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000); *see Simms v. Oklahoma*, 165 F.3d 1321, 1330 (10th Cir. 1999) ("Our role is to prevent unlawful [employment] practices, not to act as a 'super

personnel department' that second guesses employers' business judgments."). Upon notification that Seeger was at Oktoberfest while on disability leave, CBT conducted a thorough investigation and relied upon the facts that were before it at the time the decision was made. Seeger's mere recitation of competing facts, do not establish that CBT failed to made a reasonably informed and considered decision. Therefore, Seeger has failed to demonstrate that CBT's proffered reason for his termination was a pretext for FMLA retaliation.

### III. CONCLUSION

Because Seeger failed to establish that CBT's reason for his discharge was pretextual, no genuine issue of material fact remains to whether CBT interfered with Seeger's rights or retaliated against him in violation of the FMLA. Accordingly, for the reasons stated herein,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. #29) is hereby **GRANTED**.

This 17th day of August, 2010.



Signed By:
*David L. Bunning* DB
United States District Judge

G:\DATA\Opinions\Covington\2-08-207 MOO.wpd